**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*,<br>v.<br><br>THE EQUIVALENT VALUE OF USDT, OR TETHER, AS CURRENTLY ASSOCIATED WITH TETHER WALLET ADDRESS TBaBYZNqMTFU6Qg9LMPRXYYQLj1mJVz98V, TETHER WALLET ADDRESS TCq9cYJxMNdnqqgCg9URkrH2BTK5uYd4d3,<br>*Defendants*.<br><br>[Claimants: Tether, Vladimirs Ivannikovs] | 3:26-cv-____________<br><br>November 4, 2026 |

**VERIFIED COMPLAINT OF FORFEITURE**

Now comes the Plaintiff, United States of America, by and through its attorneys, David X. Sullivan, United States Attorney for the District of Connecticut, and David C. Nelson, Assistant United States Attorney, and respectfully states that:

1. This is a civil in rem action brought to enforce the provisions of 21 U.S.C. § 841, 21 U.S.C. § 846, 18 U.S.C. § 1956, and 18 U.S.C. § 1957.

2. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. Venue is appropriate in the District of Connecticut by virtue of 28 U.S.C. § 1395(b).

3. The Defendant Assets are the equivalent value of USDT, or Tether, as currently associated with tether wallet address TBaBYZNqMTFU6Qg9LMPRXYYQLj1mJVz98V ("Defendant Asset 1") and tether wallet address TCq9cYJxMNdnqqgCg9URkrH2BTK5uYd4d3 ("Defendant Asset 2").

4. The Defendant Assets are property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1), or a conspiracy to commit such offenses in violation of 21 U.S.C.

§ 846, and/or any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such offenses, and, therefore, subject to forfeiture pursuant to 21 U.S.C. § 881(a). Additionally, the Defendant Assets are property involved in money laundering offenses, or a conspiracy to commit such offenses, in violation of 18 U.S.C. §§ 1956 and 1957 and/or are property traceable to such property, and therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A).

**Background**

5. Transnational Criminal Organizations ("TCO") and Drug Trafficking Organizations ("DTO") use a variety of methods to move the proceeds of their drug distribution and other funds to further their drug trafficking operations. One method involves moving cryptocurrency through unhosted cryptocurrency wallets. Specifically, by moving cryptocurrency through unhosted wallets, TCOs and DTOs conceal–or attempt to conceal– the source of their funds. As a result, cryptocurrency wallets are involved in money laundering.

6. In this case, law enforcement knows through facts learned during its investigation, set forth below, that certain cryptocurrency transactions and wallets contained proceeds of drug trafficking, facilitated drug trafficking, and were involved in money laundering. Focusing on these transactions and wallets, law enforcement then used blockchain analysis tools to trace backward, to learn which wallets transferred cryptocurrency to the identified wallets, and trace forwards, to learn where the identified wallets sent cryptocurrency. All of the transactions herein were made in furtherance of the drug trafficking conspiracy.

7. During April 2026, the Drug Enforcement Administration ("DEA") arranged for two money-laundering transactions involving the proceeds of drug trafficking from an

individual who had previously been convicted of drug trafficking in federal court ("Individual 1").

8. In general, the brokers reach out to money launderers to offer a contract, requesting that the money launderer arrange for a sum of money in the United States to be laundered. The money launderer then provides contact information for a money launderer in the United States. In connection with the contracts, the individual who accepts the contract will provide the broker with a passcode, such as the serial number of a dollar bill. The broker will provide the passcode to a money courier, who will provide drug proceeds to the person -- the launderer, or the undercover agent acting as one -- who provides a dollar bill with that serial number. After the courier provides the launderer with cash, the launderer converts the cash to cryptocurrency and remits it to the wallet(s) provided by the broker.

9. The DEA money laundering transactions fit the above-described pattern and involved money pickups in Illinois and Connecticut.

10. The DEA, or individuals acting at the behest of the DEA, posed as U.S. based money launderers and picked up over $300,000 in drug proceeds in these transactions. The DEA laundered the proceeds by purchasing an equivalent amount of USDT and transferring the USDT to cryptocurrency wallets provided by Individual 1 and his associates. Consistent with the general practice of money laundering, the DEA charged a commission for laundering the proceeds for Individual 1.

*Money Pickup in Chicago*

11. In late April of 2026, the DEA, or an individual acting at the behest of the DEA, posed as a money launderer and conducted a money pickup in Chicago, Illinois of approximately $103,000 in bulk narcotics proceeds that were delivered by Individual 1. Individual 1

delivered the U.S. currency, in rubber-banded bundles in a blue backpack, to a DEA undercover agent in a parking lot in Chicago, Illinois. The DEA undercover agent provided Individual 1 with a dollar bill with a pre-arranged serial number, so that Individual 1 could confirm that he was meeting with the right person. The transfer of rubber-banded bundles of bulk currency in this manner is associated with large scale narcotics trafficking.

12. Two days later, an undercover DEA wallet transferred a total of approximately 100,000 USDT into an unhosted Tron wallet, namely, **TDTGdo**ZqWW9qX84FvCNTCftjxHSdsVqdTY ("Wallet A"), that was provided by Individual 1's money laundering organization.

13. From there, blockchain and other analysis revealed that less than fifteen (15) minutes after this initial transaction, Wallet A sent 100,000 USDT to unhosted wallet **TC3uo5**h4sAdSUo9duYJ3SGnJKH4wwqaet3 ("Wallet B").

14. Approximately twenty-five (25) minutes later, Wallet B sent 100,000 USDT to Defendant Asset 1, which then sent 580,000 USDT (including 100,000 USDT from the undercover DEA wallet) to **TFZzP9**9ticdSU41c3HepRYupPBt6Vf8PNj ("Wallet C") three days later.

15. Less than fifteen (15) minutes after receiving the 580,000 USDT, Wallet C sent 50,000 USDT to **TDZCCJ**pnxZrkTcc45MhFoGsvPCeVk1oXpj ("Wallet D"), consisting of narcotics proceeds from the undercover DEA wallet.

16. One day later, Wallet D sent 80,600 USDT (comprised of the 50,000 USDT from the undercover DEA UC wallet) to **TURCwb**dL5NCg9awpYuhrjq4BDvJpagdAkd.

*Money Pickup in Connecticut*

17. Also in late April of 2026, the DEA, or an individual acting at DEA's behest, conducted a money pickup in Meriden, Connecticut. At that time, Individual 1 delivered $198,000 of narcotics proceeds. Individual 1 delivered the U.S. currency, in rubber-banded bundles in a backpack, to the DEA in Meriden, Connecticut. The DEA provided Individual 1 with a dollar bill with a pre-arranged serial number, so that Individual 1 could confirm that he was delivering the currency to the correct person. The transfer of rubber-banded bundles of bulk currency in this manner is associated with large scale narcotics trafficking.

18. Consistent with the Individual 1's, or his associate's, instructions, after the pickup but on the same day, DEA transferred a total of 192,060 USDT into Wallet A.

19. From there, blockchain and other analysis revealed that approximately forty-five minutes after the DEA undercover wallet sent the 192,060 USDT, Wallet A sent 190,000 USDT to Wallet B, which is an unhosted wallet on the Tron blockchain. Approximately one hour later, Wallet B sent 175,000 USDT to Defendant Asset 1. The following day, Wallet B sent an additional 17,900 USDT to Defendant Asset 1, totaling 192,900 USDT.

20. Approximately a week later, Defendant Asset 1's next transaction was a withdrawal of 52,910 USDT (comprised of narcotics proceeds sent from the DEA undercover wallet) to Wallet C.

21. Within three minutes, Wallet C sent 100 USDT to unhosted Tron Wallet **TCq9cY**JxMNdnqqgCg9URkrH2BTK5uYd4d3 (Defendant Asset 2).

22. A small transfer to a cryptocurrency wallet before a larger transfer is indicative of a test transaction.

23. The test transfer (consisting of 100 USDT) from Wallet C to Defendant Asset 2 is significant because Wallet C received narcotics proceeds from the money pickup in Chicago and the money pickup in Connecticut.

24. Approximately three minutes after the test transfer of 100 USDT, Wallet C sent 199,000 USDT (comprised of narcotics proceeds sent from the DEA undercover wallet) to Wallet D.

25. Within three hours, Wallet D sent a total of 131,450 USDT (comprised of narcotics proceeds sent from the DEA undercover wallet) to Defendant Asset 2.

26. The following chart sets forth the transfers from the money pickup in Connecticut:




27. The Defendant Assets are property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1), or a conspiracy to commit such offenses in violation of 21 U.S.C. § 846, and/or any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such offenses, and are property involved in money laundering offenses, or a conspiracy to commit such offenses, in violation of 18 U.S.C. §§ 1956 and 1957.

28. In addition to the above analysis, law enforcement is aware that several of the wallets listed in the above chart are sending and/or receiving exposure to other wallets that have been investigated and/or seized by law enforcement.

*Status of Wallets and Seizure*

29. Individual 1 and/or people associated with Individual 1 used the Defendant Assets as a collection point for several money laundering operations. The collection of funds from intermediary wallets like Wallet A and Wallet B is a common practice utilized by money launderers to create additional layering in their money laundering activities. This is typically done to discourage law enforcement efforts from tracking the movement of illicit funds.

30. The wallets involved in this conspiracy engaged in a specific pattern and practice following the receipt of funds generated from money pickups: following receipt of the pickup funds, the USDT wallets provided by Individual 1 and/or people associated with Individual 1 would quickly transfer the funds to an intermediary USDT wallet. The intermediary USDT wallet would then accumulate a large amount of USDT from transfers from multiple wallets. The intermediary wallets would then transfer all, or a large portion of, the funds it received to wallets such as the Defendant Assets. Typically, this process would occur on the same day or shortly thereafter.

31. This pattern demonstrates that the Defendant Assets are not controlled by an individual conducting legitimate business transactions, but rather that they are controlled by multiple individuals or an organization.

32. The Defendant Assets were seized pursuant to a seizure warrant issued in the District of Connecticut.

33. Following the freezing and/or seizing of the Defendant Assets, four individuals reached out to Tether regarding the Defendant Assets. Tether independently determined that one individual did not have a legitimate interest in the Defendant Assets. Tether provided the

DEA's information to the other three individuals. Of these three, only one individual reached out to DEA and provided information. That individual is listed as a claimant in the caption of this case.

Wherefore, the United States of America prays that a Warrant of Arrest *In Rem* be issued for the Defendant Assets; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the property to be condemned and forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

The United States requests a trial by jury.

DAVID X. SULLIVAN,
UNITED STATES ATTORNEY

By: /S/ David C. Nelson
David C. Nelson (ct25640)
Assistant U.S. Attorney
157 Church Street, 24th Floor
New Haven, Connecticut 06510
Tel: (203) 821-3700
Fax: (203) 773-5373
David.C.Nelson@usdoj.gov

**DECLARATION**

I am a Special Agent with the DEA, and the individual assigned the responsibility for this case.

I have read the contents of the foregoing Verified Complaint of Forfeiture and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 4th day of November, 2026.

/s/ Eric Milne
ERIC MILNE
SPECIAL AGENT, DEA